Good morning. May it please the Court, Albert Garcia appearing on behalf of the defendant and appellant, Dr. Keith Perry. I want to focus my remarks this morning on two issues, one dealing with the conflict of interest involving Dr. Perry's trial counsel, Mr. Brooklier, and the other dealing with the claim of ineffective assistance of counsel. But I want to use as a jumping off point a moment in the chronology of this case to which I'd like to invite the Court's attention. That moment was on June 1st of 1998. On that date, 40 non-excludable days under the Speedy Trial Act had already transpired. And on that date, the Office of the Public Defender declared a conflict. That office had previously been representing Dr. Perry. And that office declared a conflict on that date, was relieved, and a new counsel was appointed, Mr. Nicolason, I believe is the attorney's name. And Mr. Nicolason came into the case on that day. It was June 1st. The trial was set at that time for June 9th. And Mr. Nicolason made a motion to continue the case for seven months. That would take the case to January 12th of 1999. The record of that proceeding indicates that the trial judge, the district court, made no inquiries whatsoever under the Speedy Trial Act. And having made no inquiries, made no findings to justify a continuance of any length, and in particular, a continuance of seven months. There is an indication in the record of the proceedings for June 1st that Mr. Nicolason, coming into the case, made a representation to the court that this was a complex case. And later, Your Honors are aware, a stipulation was filed, and when I say later, it was nearly three months later, that purported to provide the findings under the Speedy Trial Act, which would have found a suitable time for that continuance. Now, did your client join in that request, or it was just his counsel? Well, it was counsel who had just substituted in on that date who made the request. And then subsequently, of course, Dr. Perry signed off on the stipulation, which was signed and entered, I believe, almost three months later. So he did. He did sign that. He did sign. The problem I have with that stipulation, Your Honors, is that although I recognize that this Court has previously held that you don't need to have simultaneous findings under the Speedy Trial Act, that is, the findings don't have to be simultaneously made with the actual grant of the continuance. They can come later. I understand there are cases along that line. However, the problem I have with this particular stipulation is that there's nothing in the record of the June 1st proceeding that would support the findings. So if you had, for example, if the district court judge had made inquiries on June 1st, for example, inquiring why is this case complex? What is it about the nature of this prosecution that makes it a complex case? Are there any novel questions of law? Any novel questions of fact? We know we only have one defendant. Why do you need a seven-month continuance? Those are the kinds of inquiries that are mandated by the Speedy Trial Act and were not inquired into by the district court. Now, if an inquiry had been made along those lines, followed by findings later on, I wouldn't be standing here before you today and making this argument. The problem with those findings based on stipulation of counsel which were filed nearly three months later is that if you look back in time from those findings to the June 1st, 1998 proceeding and look at the record of that proceeding, there's nothing in that record to support those findings. It's a clear afterthought attempt to justify the continuance and to, in effect, put words into the mouth of the district court which were never uttered on June 1st. Now, the government in its brief concedes that no inquiries were made. Well, the judge had had the case for some time. Well, Your Honor, the case, I believe the arraignment was in April, April 20th, 1998. And I don't see any indication of any other proceedings on this matter until June 1st. And that's when the public defender's office came in and declared a conflict. But he has the file. You see, it's his case. He's got the file. That's true. It doesn't come from some master calendar to him. It comes right there. So it belongs to him. So we have to assume, based on our experience, that he knows about the case. He's reviewed it. He has an indictment. He knows what's involved. Well, he has an indictment. How many counts did you have in this indictment? Something like 40, 42 or something like that. That's true, Your Honor. I mean, when he gets a case like that, he's aware of it. Well, let me say this. And I – and indulge me for a moment. He took the plea, didn't he? He took the arraignment, right, the arraignment. Yes, he did. Wasn't there a change of judge at some point? Yes, there was. Initially, he was assigned to another judge and then reassigned to Judge Hatter because he had apparently presided over a related case previously. So I'm not even certain that the plea of not guilty was actually entered in Judge Hatter's court. I don't know. I'll have to look in the record for that. But the – I do want to make one comment, Your Honor. And I want to preface it by saying this. I don't do criminal work. I rarely escape from the confines of administrative tribunals where I represent physicians in disciplinary matters before the Medical Board of California. So this is an exceptional experience for me. But I can say that, having said that, I often encounter Medi-Cal fraud cases in the context of a medical board disciplinary proceeding. And I can tell you that there's nothing extraordinarily complex about this case, nothing uniquely complex about it whatsoever. The usual run-of-the-mill Medicare fraud case always involves an allegation that the physician has rendered some services which were not medically indicated or, as in this case, that he has authorized medical equipment which was not medically indicated. So there's nothing unusual or inherently complex about it. I understand that there are other allegations that Dr. Perry misrepresented matters during the course of bankruptcy proceedings and that he secreted assets from a receiver. But, again, other than the fact that we have 40-some-odd counts, there's nothing inherently complex about this case, although that characterization has been bandied around, I think, quite indiscriminately in the government's brief and in representations made to the trial court itself. In any event, there is case law that says that the district court has an independent obligation to make its own independent inquiry into whether this case qualifies as a complex matter under the Speedy Trial Act. That clearly was not done. So I think we have a Speedy Trial Act violation apparent from this record. The question then becomes, and here I'm moving on to the context of ineffective assistance of counsel, the question becomes what was done about it? And the answer is a resounding nothing. If you'll give me just a moment, I'm drying up a little bit. We've got to take your time. Tell me, why did Nick Lason get out of the case? Let me look at my timeline here. I believe he was substituted out of the case. He was substituted out, but it wasn't quite clear to me why. I think Dr. Perry retained private counsel at that point. I think that's what the record indicates. It was your client who made the change. Yes, he made the change from Nick Lason to another counsel. But when Mr. Nick Lason came into the case, Dr. Perry had nothing to do with that. That was a matter of conflict of interest being declared by the public defender's office at that point. And I think it's important to note that the government concedes that our calculation of when the matter was supposed to go to trial under the Speedy Trial Act was correct, and the date is July 1st, 1998, and the government also concedes that there were no inquiries made on June 1st. So if the Speedy Trial Act violation existed or exists, rather, on this record, it turns or falls, stands or falls, rather, on the basis of that stipulation that was filed nearly three months later. And for the reasons I've already stated, I believe that that stipulation is ineffective to cure the deficiency that occurred on June 1st, 1998. Now, subsequent to that, he had, I guess, three more lawyers, and nobody ever raised the Speedy Trial Act. Nobody ever raised it. And, you know, the government makes an argument in its brief and says, well, wouldn't it be unethical or unusual, or perhaps even in bad faith for the attorney who actually requested the continuance to come back and tell the judge, by the way, Your Honor, you made error, you committed error by granting the continuance in the first place. And that argument has some appeal at first glance, but if you really dig into it and think about it, I don't see anything inherently inconsistent, or certainly I don't see anything unethical about it, with having an attorney request a continuance because he deems or she deems it necessary for additional preparation, and later coming back in the court and saying, Your Honor, I realize I made this request of you and you granted it, but there is a defect in the process by which the request was determined. And the reason I think it would not be inconsistent for an attorney to do that is that it is the district court's responsibility to make the specified inquiries and the specified findings. It's not up to counsel to make those inquiries for the trial judge, and it certainly isn't up to counsel to propose any findings in connection with those determinations under the Speedy Trial Act. So it may put counsel in an uncomfortable position to do that, But it certainly, I don't see any bar to that kind of a motion, even when it's the attorney who had requested the continuance in the first place. Yeah, and this is after a verdict. I beg your pardon? After a verdict. You mean the motion? Yeah. Well, the motion to dismiss was never made. I mean, the issue ripened after the 70-day period elapsed. And Mr. Nicolaisen never did anything about it except sign a stipulation three months later where a stipulation, the findings that would have found this a reasonable continuance under the circumstances. What was the harm? Well, we have a Speedy Trial Act violation. Well, what we would get, I suppose. I mean, not the theoretical harm. What was the actual harm? You'd get a dismissal without prejudice, probably. Yeah. Well, I understand the question. Well, I understand that. All right. Actually, the government has conceded that the government has made the argument, wouldn't this all have been futile? We would have refiled the case anyway. With some exceptions, though, the government concedes that there were probably five, perhaps even six, and I could be mistaken about it. Mr. Rockman will correct me when it's his turn to address the Court. But I believe there were five or six counts that would not have been able to have been refiled because of the statute of limitations. So I would not have characterized this as a futile gesture. I don't think it would have been a pyrrhic victory at all. There was some tangible benefit to be derived from making this motion. When you're a defendant facing multiple counts and you eliminate five of them, I think you've gained a benefit. You're spending all your time on one issue. Yes, I am. Okay. I'm going to move on to the next issue, which is the conflict of interest. And that, again, involves Mr. Brooklier coming into the case. He came into the case in October of 1999. The transcript of the proceedings for that day is very abbreviated. Mr. Brooklier appears and requests permission to substitute in. The district court says permission granted. Only after the permission is granted is there discussion about the potential conflict involved with Mr. Brooklier. And the potential conflict really rests on two prongs, one that he had previously represented a potential adverse witness against Dr. Perry. I'm not going to dwell on that one. But the other one I think is significant, and that is that Mr. Brooklier himself had been prosecuted criminally by the same agency that was prosecuting Dr. Perry. And I think the district court, what happened with the district court is it took a very narrow view of the situation. And he had already been sentenced. It had already happened. You know, well, you were sentenced. It's over. It's over with. Well, I think that's too narrow, because he was on suspension from the State Bar. Later he was suspended, but I think significantly, and for purposes of our conflict of interest argument, he was still laboring under criminal sanctions in the sense that he was still on probation. And he had certain conditions of probation to comply with. The client was aware of this. Well, the client was aware that he had a conviction, but the extent of his probationary status was not discussed with the client. It's not appearing from the record. And the important issue here is here's Dr. Mr. Brooklier representing Dr. Perry while he's still laboring under the potential for criminal sanctions, because he has obligations under his probationary grant. If he should fail to comply with those obligations, then the same agency that's prosecuting Dr. Perry would be in a position to prosecute a probation violation against Mr. Brooklier. I'm surprised that he was even allowed in the courtroom. Once you're convicted, aren't you supposed to be immediately suspended? I believe at the time that this occurred, Your Honor, the rules were different. I think today there's an automatic suspension following a felony conviction, and I believe this was a misdemeanor conviction at any rate. So there was no automatic suspension. But then later, of course, he was suspended by the state bar because of the criminal conviction. But the other issue, and I'm going to finish up here in a couple minutes and reserve a couple more for rebuttal. The other issue is that not only was there a conflict. I think that's clearly a conflict, because he has to walk a fine line here. He has to deal with the same agency who is prosecuting his client. He might have to deal with that agency later if he fails to comply with his probationary obligations. So I think there is a conflict. The other issue is, did it adversely affect his representation? I believe the record, again, discloses that at the time that he entered the case, he requested a continuance, which is not out of the ordinary. It's a new attorney to the case. But what's really to the case — Well, he asked for seven to ten days, and the judge gave him, what, a six, seven-month continuance? Let me do my math here. Yeah. I think the judge gave him four months after that, to February. Oh, he gave him four months after that. Right. Did he have to get out of the halfway house before he could proceed? Well, that's not clear from the record, Your Honor. That's one of the issues here that I think is really significant about Dr. — I'm sorry, Mr. Brooker coming into this case. The record discloses — we have the docket, you know, for Mr. Brooker's case. The record discloses that he was sentenced to eight months' confinement in this halfway And he began his commitment on April 1st. And again, I'm going to do the math. I'm not very good at it. But that comes to, I believe, December 1st. So the trial was then set for November 16th. So there's a question there whether he would have been available. And even if he's in a halfway house, we don't know just what the circumstances were, how much liberty he had, how much time he had at his disposal to prepare for this trial. And the problem that we don't have that information is because the district court really did not make an adequate inquiry of this potential conflict. It just relied on the representation of Mr. Brooklier that he had explained everything to Dr. Perry and left it at that with no other inquiry. And I think that that's where the — obviously, the failure in this record to disclose just how — the circumstances of his confinement. We're stuck with that because the trial judge did not make the adequate inquiry. I'll reserve the rest of my time. Thank you very much, Your Honor. All right. Yes. May it please the Court. Paul Rockness for the United States. I'd like to address the conflict of interest issue first because that's what you were just hearing about. He's alleged — the defense has alleged two conflict of interest claims. One has to do with Brooklier's — Mr. Brooklier's prior criminal conviction. The other has to do with his prior representation of a potential witness who was not a witness, this individual, Gene Woods. Under the Supreme Court decisions of Qualer v. Sullivan and Mickens v. Taylor, the defendant, in order to prevail, would have to show not only that there was an actual as opposed to a potential or possible conflict of interest, but also an adverse consequence. And this — You're going to talk about the footnote from Mickens? I wasn't planning to. Is that — No, I wasn't planning to. I was going to, but — The little footnote there, the case called Campbell v. Rice. Yes, I'm aware of Campbell. Yes. And both Campbell decisions. And on the second time around in Campbell, this Court said that the automatic reversal rule had been effectively overruled by Mickens v. Taylor. Mr. Ferguson and I are very familiar with that. Okay. I will not belabor the point. The point I wanted to make, though, is that neither of the alleged conflicts here, even if there was an actual conflict, and we don't believe there was, would give rise or gave rise to any adverse consequence. The allegation with respect to Mr. Brooklier having had that criminal conviction was that he was in a halfway house. There's absolutely nothing in the record to suggest that that halfway house sentence is any different than any other halfway house-type sentence, and that Mr. Brooklier had any restrictions whatsoever in terms of his daytime work activities. And there's nothing in the record to suggest that Mr. Brooklier sought a continuance or obtained a continuance because he wanted to get out from under the halfway house sentence. In fact … Well, why did the judge give this long continuance then? What actually happened here, Your Honor, is that Mr. Brooklier initially said that he was going to ask for only a week to two weeks, but we had agreed going into the court to ask for that time. You and Mr. Brooklier? Yes, the three months. That's what we told the court. And the defendant later stipulated that that was appropriate. What is the duty of the U.S. attorney when the U.S. attorney knows that there is a possibility, maybe even a strong probability of conflict of interest, when the attorney for the defendant is being prosecuted by your office? What duty does the U.S. attorney have? Well, we thought we were carrying that out by bringing it to the attention of the court. We were the ones who brought it to the attention. Did you make a motion to disqualify him? Did you tell the judge, in your opinion, that he should get a new lawyer, or did you just merely leave it up to the judge? No. We told the judge that we thought there was a potential conflict that should be aired, and that's why we had a status conference when Mr. Brooklier was substituting in. He may have actually had the substitution signed and may have been entered before we appeared. I don't recall the exact timing, but shortly after we learned of the substitution, we were told that there was a potential conflict because Mr. Brooklier had this conviction. What must you show, what must the defendant show that this conflict, his counsel is being charged by the same U.S. attorney's office, in order that there be a legal conflict of interest that the defendant has to get a new lawyer? Okay. He would have to show that there is an actual conflict. Well, how do you do that? That's what I'm saying. How do you do that? You see, you're talking in generalities. What evidence must he show to show that the attorney could not represent him properly? When there is on his face, you know, I think every layman would say, well, he can't do that. He's being charged for a crime by the same U.S. attorney's office.  He had been convicted. The case had been resolved. I don't think he was sentenced yet. He was trying to curry your favor, I'm sure. No, he had been sentenced, Your Honor. He had been? He had been sentenced more than seven months before he substituted in. But he was on probation. He was going to face a term of supervised release, and it's our contention that the fact that someone in the future, in theory, could violate supervised release and might have to face a probation or supervised release revocation proceeding is fairly speculative, wouldn't give rise to an actual conflict. But that's not the heart of my argument. The heart of my argument is even if you believed that his sentence, that all that he faced was his term of supervised release, and that gave rise to an actual conflict, that there is no adverse effect because there's nothing on the record to suggest that the fact that Mr. Brooklier was in a halfway house had anything to do with him the defendant during the daytime in court or to work at night on the case. And, in fact, Mr. Brooklier had appeared in court while he was in the halfway house for the defendant when he the hearing we had to discuss the conflict. If the court believes that that is something that should be fleshed out because there's absolutely nothing in the record to suggest that the continuance had anything to do with the halfway house sentence and the defense has conceded in their brief that any new attorney would have sought continuance, then we believe the case should be remanded to further develop the record. Now, at that point when the two of you agreed that there should be a further continuance, were you not at all concerned about the Speedy Trial Act and the length of time that this thing had gone on and on? I was not concerned, frankly, because I knew, contrary to what you just heard a few moments ago, that this was an extremely complex case, that every attorney who was getting into the case had wanted several months to prepare for trial, that we had charged originally six separate fraud schemes. We were down to four and 39 counts by the time Mr. Brooklier substituted in, but that continuance was absolutely warranted. Now, what findings did the judge make at that time? When Mr. Brooklier substituted in, and they have not challenged that continuance. Well, I'm asking about it. Okay, that's fine. The judge, prior to trial, entered findings which the defendant signed. It was a stipulation which the government signed, Mr. Brooklier signed, and Dr. Perry, the defendant, signed, that the continuance was necessary and in the interest of justice because of the complexity of the case. And I believe, and have always believed, that that was absolutely accurate. We had something like 200 boxes of discovery materials. We had all these different fraud schemes which were not overlapping. This was not, I mean, I, it's true, one of you pointed out this was a 41, it was a 41-count indictment originally, but that in itself doesn't make any sense. It doesn't mean that a case is necessarily complex. What made this case complex, this was not like the check case you heard earlier this morning where each count is simply another incident that's the same as what went before. When we started and when Mr. Nicolaisen was in this, we had six separate fraud schemes with very little overlap. Some of them had no witnesses in common with the others. So you stipulated and the judge then made findings? Yes. Contemporaneous. No, the written findings were not contemporaneous. They were issued later. But at that point, by the time Mr. Brooklier entered into the case, Judge Hatter, and I checked, by the way, while I was listening, Judge Hatter had not heard the original guilty plea that was done before a magistrate, but he had had a bond hearing in this case, and he had not heard the original guilty plea that was done before a magistrate.  And then the defendant, in addition to the continuance, the defendant had signed two stipulations. I'm not talking about that one. I'm not talking about the Brooklier continuance. What happened then? You stipulated that you wanted the continuance. They wanted it, yes. And the judge made findings then? He made findings. He entered written findings later. And I was, and if you, if I'm addressing the wrong point, then I'll turn to something else, but what the judge would have known at the time that those findings were entered and when Mr. Brooklier came into the case was that every attorney, Nick Eliason, Mr. Alexander, and David Evans before him, had all sought much lengthier continuances based on the complexity of the case, and that the defendant at that point had already signed two stipulations, one under Nick Eliason and one under Mr. Alexander, that those continuances were appropriate and necessary. And should I proceed? Yes. Okay. What I was saying is if Your Honors believe that what was going on at the halfway house and its impact is a mystery and that needs to be resolved, then it would be appropriate either to affirm the conviction without prejudice to a collateral proceeding, say a 2255 motion, where we could develop evidence, or remand so that the district court could further develop the record, because I'm confident that what we would, we would put on evidence, which we're precluded from doing at this stage in the proceedings, that Mr. Brooklier's halfway house sentence had absolutely nothing to do with his requesting the continuance, and he had no restrictions whatsoever on his or anyone else when he was in the halfway house. The other conflict claim that's being raised has to do with Mr. Brooklier's prior representation of an individual named Gene Woods. Gene Woods and John Watts had operated a health, home health care center called United. When they were under operating with the government and told the government that they had been paying kickbacks to the defendant, that led to count 20 of the indictment, which was the home health care scheme. Had we not moved to dismiss that count, Gene Woods would have been a witness for the government to prove up the defendant's receipt of kickbacks. John Woods, the owner of United, was the person who had always claimed he had made the deal with the defendant to get the referrals in exchange for the kickbacks. We moved to dismiss that count long before Mr. Brooklier substituted in because we learned that Mr. Watts, not Mr. Woods, had been committing a tax offense, kind of a massive tax scheme while he was cooperating with us and being very friendly to me. And he was indicted for that and subsequently tried. So he was our key witness. We dismissed that count. Then Brooklier comes in. He had represented Gene Woods in an unrelated drug case. Gene Woods was not going to be a witness. I brought it to the attention of court because I said there's a possibility here that if we get a conviction and if we want to bring to the court's attention that sentencing, the home health care scheme, the facts, then there's this prior representation to think about, even though Mr. Brooklier at that point told the court that he had had no communications whatsoever with Mr. Woods at any time having to do with the home health care scheme. He knew nothing about it. There were no less was a possibility that if Gene Woods was going to be a government witness at sentencing, Mr. Brooklier might challenge or want to have challenged his credibility. And that's how the conflict could have arisen. As it turned out, and the judge thought that was too speculative, and we proceeded. As it turned out, by the time of sentencing, the defendant had fired Mr. Brooklier. He had new counsel. They did not challenge anything to do with the home health care scheme or Mr. Woods. And it just, there's just no adverse consequence whatsoever, even if there was a potential conflict. I'd like to turn now to the Speedy Trial Act claim. Well, did the client, was the client made aware, was the doctor made aware of these conflicts? Yes. It was discussed in open court beforehand, in his presence. And was he questioned about it? He was not questioned about it. Just discussed? It was discussed, and Judge Hatter asked Mr. Brooklier if he had disclosed the prior representation to Dr. Perry, and he said he had. And our point, though, is nothing came of it in any event, because we knew at the time we'd already dismissed, made a motion and had been granted to dismiss the home health care count. He was not going to be a government witness. Okay, but I'm also talking about Brooklier's problems. That was, again, the dialogue was between the judge and Mr. Brooklier. Have you discussed this with your client? He said yes. But the client was never questioned by the judge. The client was not questioned himself. And no waiver was taken. No waiver was taken, and we had suggested maybe that would be appropriate. The judge felt it was unnecessary. But our argument here under Mickens is, in any event, there's no adverse consequence because their only complaint is there's this continuance. And frankly, I don't see how a continuance could be an adverse consequence in any event. But they certainly have not said there was, and the defendant stipulated that that continuance was appropriate. He's not claiming any Speedy Trial Act violation or any other problem arising from that. He's just saying that Brooklier's halfway house sentence was the motive. And we're saying there's absolutely no evidence of that. If I could, though, just because I'm running out of time, I'd like to move to the Speedy Trial Act claim. The issue here on appeal, since the no Speedy Trial Act claim was made prior to trial, is whether or not the attorneys from Nicolaison on through trial were ineffective for failing to make the motion. And I want to address first Nicolaison's conduct. And the point, the principal point I want to make is that whether or not there was a Speedy Trial Act violation at the time that the continuance, which is under challenge, which is this June 1 continuance, was granted because the judge did not make sufficient inquiry or findings, no defense attorney from Nicolaison on down through Mr. Brooklier would reasonably or could reasonably have been expected to make a motion to dismiss the indictment. In Nicolaison's case, at the time the continuance was granted, we'd had a hearing about the public defender being dismissed. It was discussed that it was an extremely complex case. And at the hearing, I had told the judge, we don't want to have a conflict arise with the public defender three, four, five, six months down the road. That's what we were talking about. The public defender, at that hearing it came out, was going to ask for a continuance to December of six months or January, seven months, had that trial. A new attorney is substituting in and clearly a continuance is necessary. Nicolaison knew all this, and this would have come out in any hearing if he'd made a motion to dismiss the indictment. And the fact is that his client signed later, a couple months later, it's true, on a stipulation that said that he agreed to the hearing as well. If Nicolaison had moved, despite all those facts, let's say, as they say in their brief, he had refused to sign a stipulation under the speed trial act for the continuance that he had sought and had instead made a motion to dismiss the indictment. If he had done that, the indictment would certainly have been, if it had been dismissed at all, it would have been dismissed without prejudice, because the factors in the statute that the Court would have looked at are the importance of the case, well, it was a multi-fraud case involving millions of dollars in losses, multiple victims. The circumstances of the continuance and dismissal, the circumstances was they wanted it, not us, and the impact on the administration of justice, which would have been no adverse impact from dismissing without prejudice, and possibly adverse impact if the judge had dismissed with prejudice, because it would have looked like someone was gaming the system. We simply would have re-indicted the multiple counts. There were a few counts that would have been lost, but all six schemes would have remained in the indictment. That's in our brief. In terms of relevant conduct, sentencing, it would have made no difference. Now, if you look at the case of Ken Alexander, we have two stipulations. He obtained one that the defendant wanted the continuance. No subsequent attorney would have had any reason to think, in light of Judge Hatter's findings, not having been at the hearing, that there had been even a speedy trial-like violation, or that a motion would have been granted because the defendant had signed on. Well, the defendant was on bail. And he was on bond the whole time, and he signed on, and there's this Palomba case, and the other cases we cited, they cited the Palomba case, which says if a defendant asks for the continuance and agrees that the grounds are appropriate, he's precluded from making the motion. All the subsequent attorneys would have been aware of that, and they would have been facing these findings. It would have been unthinkable for them to have made the motion under those circumstances. And therefore, we believe there is, even if there was a violation, there's absolutely no prejudice. Your Honors, I'm running out of time. Do your Honors have any questions? No questions. Thank you very much. All right. You've got about three minutes for rebuttal. Thank you very much, Your Honors. I just want to briefly refer you to the transcript of the proceeding involving the initial continuance. This is Nicolaison, June 1, 1998. There was no discussion about the complexity of the case. The only comment was Mr. Nicolaison's own statement, and he says if it's agreeable with the Court given the complexity of the case. That's the only statement. There's no discussion on the record. And again, I know there's a difference of opinion between us about just how complex this case was. I've already stated my remarks on that, so I'm not going to go into that again. Maybe if there's a new trial, you can be the trial lawyer. And we set the time for, you know, a three-day trial, and off we go. Well, you know, the case was actually tried in eight days. So one defendant's case was tried in eight days. I mean, that's how complex it was. But at any rate, here we have the transcript of Brooklier substituted into the case, and this is the extent of the inquiry made by the district court regarding the conflict. After they discussed the fact that he's been convicted, the judge says, I take it your client has been advised. Has he? Response by Mr. Brooklier, on both issues, Your Honor. That's it. No more. No further inquiry. If there had been a little bit more inquiry, we would have found out that Brooklier, although previously convicted, was on probation. He was under the obligation to comply with certain terms and conditions of probation, including the confinement. We would know more about it. We'd have a record that would flesh it out and let us know just what disabilities he was laboring under at that time. As to the adverse effect of the conflict, this court has previously held. You can see I'm out of my league here. The court itself must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conflict. That's Sanders versus Rotel. And then in another case, the same case, the court comments that courts have found adverse effects following a conflict of interest. Where counsel failed to present evidence which, if offered, might have put enough uncertainty into the minds of the jury as to raise a reasonable doubt. Now, let me just say this. This is a case where the government is claiming that the authorization or the prescriptions issued for these devices, durable medical equipment, lacked a medical indication. And the government brought in its expert witness, a doctor who got on the witness stand and said, I reviewed the files, the patient charts, and here's my opinion. No medical indication for this equipment. Now, how do you defend a charge of that nature without bringing in your own medical expert to raise a reasonable doubt as to the propriety of the prescriptions or the authorizations? This court has said, you know, we may find an adverse effect by the way the case was handled and whether evidence which should have been offered or one would reasonably expect to have been offered was not offered. So there's an adverse consequence manifest from the face of this record. Just one other comment here. The findings with respect to all the excludable time, there was a stipulation that was filed on the date of trial. That was February 16, 2000, prepared by the U.S. Attorney's Office. And that was the included stipulation excluding the time from the point that Mr. Brooklier entered the case and the matter was continued for trial until February 16th. Thank you very much, Your Honor. This matter will stay in submittal.
judges: B. Fletcher, Pregerson, Ferguson